# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| SARAH M. GARDNER, )<br>   Plaintiff )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>  Commissioner of Social Security, )<br>   Defendant )<br>) | Civil Action No. 2:11cv00011<br><br>**REPORT AND RECOMMENDATION**<br><br>BY: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Sarah M. Gardner, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gardner protectively filed her applications for DIB and SSI on July 18, 2008, alleging disability as of November 15, 2006, due to degenerative disc disease, bulging and protruding discs, arthritis, migraine headaches and endometriosis. (Record, ("R."), at 108-14, 138, 142.) The claims were denied initially and on reconsideration. (R. at 56-58, 64, 65-66, 68-69.) Gardner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 70.) A hearing was held on March 23, 2010, at which Gardner was represented by counsel. (R. at 26-50.)

By decision dated May 17, 2010, the ALJ denied Gardner's claims. (R. at 10-21.) The ALJ found that Gardner met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 12.) The ALJ also found that Gardner had not engaged in substantial gainful activity since November 15, 2006, the alleged onset date. (R. at 12.) The ALJ determined that the medical evidence established that Gardner had severe impairments, namely degenerative disc disease of the lower spine with spondylosis and radiation of pain to lower extremities, right side more than left, and a long history of headaches, but he found that Gardner's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix

1. (R. at 12-15.) The ALJ also found that Gardner had the residual functional capacity to perform sedentary[1] work that allowed brief positional changes of approximately once every 15 minutes without leaving the work station, that did not require operation of foot controls, that required no more than rare climbing of stairs and ramps and kneeling, only occasional balancing and stooping and did not require her to climb ladders or scaffolds or exposure to workplace hazards and extreme temperature changes. (R. 15-16.) The ALJ also found that Gardner could perform work that required only short simple instructions. (R. at 16.) Therefore, the ALJ found that Gardner was unable to perform any of her past relevant work. (R. at 19.) Based on Gardner's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including jobs as an assembler, a packer and an inspector/tester. (R. at 19-20.) Thus, the ALJ found that Gardner was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20-21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Gardner pursued her administrative appeals, (R. at 102), but the Appeals Council denied her request for review. (R. at 1-6.) Gardner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Gardner's motion for

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2011).

Case 2:11-cv-00011-JPJ-PMS   Document 16   Filed 03/15/12   Page 3 of 16   Pageid#: 649

summary judgment filed July 26, 2011, and the Commissioner's motion for summary judgment filed August 24, 2011.

## *II. Facts*

Gardner was born in 1979, (R. at 108, 113), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has three years of instruction with training in aerospace propulsion and past relevant work as a jet engine mechanic and a secretary. (R. at 31-32, 148.)

John Newman, a vocational expert, was present and testified at Gardner's hearing. (R. at 45-50.) Newman was asked to assume a hypothetical individual of Gardner's age, education and work experience and who had the residual functional capacity to frequently lift objects weighing up to five pounds and occasionally up to 10 pounds; could sit for up to six hours in a day; stand and walk for up to two hours in an eight-hour workday; who would require brief position or posture changes at 15-minute intervals approximately, but not leave the workstation; frequently, but not continuously or constantly use the hands or upper extremities; who could never operate foot controls; who could occasionally balance or stoop; who could rarely climb stairs or ramps and kneel; who could never climb ladders or scaffolds and crouch or crawl; who would have to avoid exposure to extreme cold or heat; and who could understand, remember and carry out no more than short, simple instructions, but could maintain attention and concentration to perform short simple instructions. (R. at 46.) He stated that such an individual could perform jobs that existed in significant numbers, including jobs as an assembler, a packer, an inspector, a tester and a sorter. (R. at 46-47.)

-4-

In rendering his decision, the ALJ reviewed records from Lonesome Pine Hospital; Community Medical Care; Dr. David A. Wiles, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Joseph Duckwall, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and Medical Associates of Southwest Virginia. Gardner's attorney also submitted medical records from Norton Community Hospital; Medical Associates of Southwest Virginia; Wellmont Health System and Spectrum Laboratory; and Community Physicians to the Appeals Council.[2]

The record shows that Gardner was treated at Community Medical Care from January 2008 through February 2009 for complaints of back pain, migraines, fatigue, anxiety and stress. (R. at 302-29, 345-56, 411-30.) On January 24, 2008, Nicholas Sluss, PA-C, a physician's assistant, diagnosed Gardner with acute lumbago, unspecified acute migraine and acute hyperlipidemia. (R. at 305-09.) On February 19, 2008, Dr. Joselin Tacas Tacas, M.D., reported that examination of Gardner's cervical spine showed no abnormal curvatures, was nontender and had full range of motion. (R. at 310-14.) Examination of Gardner's thoracic spine showed no abnormal curvatures and no point tenderness. (R. at 313.) Dr. Tacas reported that examination of Gardner's lumbar spine showed point tenderness and paralumbar muscular spasms. (R. at 313.) Dr. Tacas reported that Gardner had good muscular coordination and strength bilaterally and no gross sensory deficits.[3]

---

[2] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-6), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[3] Examinations were performed on July 14 and 21, 2008; September 12, 2008; October 13, 2008; November 12, 2008; December 10, 2008; January 5 and 14, 2009; and February 18,

(R. at 313.) On August 14, 2008, Sluss's examination rendered the same findings as Dr. Tacas's February 19, 2008, examination; however, Sluss found that Gardner had decreased motor strength in her bilateral lower extremities with clonus noted in the right lower extremity. (R. at 317, 347.) On February 18, 2009, it was noted that Gardner's chronic lumbago and chronic muscle spasm were controlled. (R. at 413.) On September 2, 2010, Dr. Tiffani M. Nichols, D.O., with Community Physicians, found that Gardner had normal motor strength. (R. at 491-94.)

On June 4, 2008, Gardner presented to the emergency room at Lonesome Pine Hospital with complaints of back pain. (R. at 257-58.) She had decreased range of motion and muscle spasms in her back. (R. at 258.) X-rays of Gardner's lumbar spine were negative, except for a few tiny anterior osteophytes. (R. at 259.) She was diagnosed with chronic low back pain. (R. at 258.) On June 7, 2008, Gardner complained of back pain. (R. at 262-63.) She was diagnosed with acute lumbar strain. (R. at 263.) On July 8, 2008, again Gardner complained of back pain. (R. at 275.) She was diagnosed with acute low back pain. (R. at 276.) On July 12 and July 26, 2008, Gardner continued to complain of back pain and was diagnosed with chronic low back pain and lumbago. (R. at 246-49, 286-87.)

On August 1, 2008, Gardner again presented to the emergency room with complaints of back pain. (R. at 264-65.) She reported that she was out of oxycodone. (R. at 265.) She was diagnosed with chronic back pain. (R. at 264.) On August 3, 2008, Gardner again presented to the emergency room with complaints of back pain and requested oxycodone. (R. at 271.) It was noted that Gardner came

---

2009. (R. at 319-26, 349-56, 411-13, 415-30.)

with MRI results in hand and that the legal problems with narcotics was discussed at length. (R. at 271.) It also was noted that Gardner was not hostile, but was angry. (R. at 272.) She was diagnosed with chronic low back pain. (R. at 272.)

The record shows that Gardner was seen at Medical Associates of Southwest Virginia from July 1, 2008, through August 24, 2010, for back pain. (R. at 386-410, 459-89.) On July 10, 2008, an MRI of Gardner's lumbar spine showed mild to moderate degenerative disc changes at the L4-L5 and L5-S1 levels; a tiny central disc nuclear protrusion and mild bulging of the annulus at the L4-L5 level; a combination of bulging annulus and mild arthritic changes of facet joints causing mild narrowing of the neural foramina on both sides at the L4-L5 level; and moderate bulging of the annulus slightly more asymmetrically toward the left than the right side at the L5-S1 level causing mild narrowing of the neural foramina on both sides at the L5-S1 level. (R. at 266-67, 330-32.) On February 20, 2009, Gardner stated that she was "feeling good" and that she did not have any problems. (R. at 397.) On March 31, 2009, it was reported that Gardner had no muscle weakness or atrophy. (R. at 392.) She had mild tenderness of the lower back and lumbosacral spinal area. (R. at 392.) Gardner was diagnosed with degenerative disc disease of the lower lumbosacral spine, low back pain and hyperlipidemia. (R. at 392.) On May 6, 2009, Gardner had mild tenderness in the lumbosacral spine area. (R. at 390.) She had full range of motion of the spine. (R. at 390.) On May 20, 2009, Gardner stated that she was feeling fine on her medications. (R. at 389.) She voiced no new complaints. (R. at 389.) On August 24, 2010, Gardner requested a prescription for Motrin. (R. at 459.) It was noted that Gardner had been taken off all controlled substance medications because she was found to be abusing them. (R. at 459.)

On July 19, 2008, Gardner presented to the emergency room at Norton Community Hospital with complaints of back pain. (R. at 529-34.) On July 22, 2008, Gardner again presented to the emergency room with complaints of back pain. (R. at 520-27.) She reported that she was out of pain medication. (R. at 524.) On July 2, 2009, Gardner again presented to the emergency room with complaints of back pain. (R. at 514-19.) Examination of her back was normal, and she had painless range of motion. (R. at 515.)

On August 8, 2008, Dr. David A. Wiles, M.D., saw Gardner for her complaints of back pain. (R. at 336-37.) Gardner stated that her pain was constant and that it was made worse by bending and twisting activities. (R. at 336.) Dr. Wiles reported that Gardner's gait pattern was normal. (R. at 337.) Her heel to toe walking was normal. (R. at 337.) Examination of Gardner's lumbar spine showed mild tenderness at the L5-S1 level. (R. at 337.) She had limited range of motion in extension. (R. at 337.) Straight leg raising tests were negative. (R. at 337.) She had normal motor strength. (R. at 337.) Dr. Wiles diagnosed degenerative disc disease at the L4-L5 and L5-S1 levels with chronic low back pain. (R. at 337.) Dr. Wiles recommended physical therapy and anti-inflammatory medication. (R. at 337.) On September 22, 2008, Dr. Wiles reported that Gardner's gait and motor strength were normal. (R. at 363.) He reported that no sensory deficits were detected. (R. at 363.) He referred Gardner for epidural steroid injection in the lumbar spine. (R. at 363.) On October 14, 2008, Gardner complained of low back pain. (R. at 360-62.) Examination indicated that her sensory and motor functions were normal. (R. at 361.) Straight leg raising tests were negative. (R. at 361.) Gardner's posture and gait were described as normal. (R. at 361.) She was diagnosed with lumbar disc, herniated nucleus pulposus; lumbar degenerative disc disease; low back pain; and

lumbosacral spondylosis without myelopathy. (R. at 362.)

On June 10, 2009, Gardner was diagnosed with mechanical low back pain without evidence of a fixed, severe lumbar radiculopathy. (R. at 443-44.) Steven J. McLaughlin, PA-C, recommended that Gardner stop smoking, continue strengthening exercises and start a walking and swimming program. (R. at 444.) He stated that Gardner had nothing dangerous and, at her age, he would not recommend any aggressive neurosurgical intervention. (R. at 444.) On October 30, 2009, Gardner had normal muscle strength. (R. at 437-38.) She had decreased range of motion of the lumbar spine. (R. at 438.) On January 12, 2010, Gardner reported that her medications only mildly improved her quality of life. (R. at 431.) Dr. Ihab Y. Labatia, M.D., reported that the Oswestry Disability Index showed a 62 percent disability rating. (R. at 431, 450-53.) On July 6, 2010, an MRI of Gardner's lumbar spine showed lumbar changes including discogenic disease at the L4-L5 and L5-S1 levels; hepatic right renal changes; and an increased T2 signal within the liver and right kidney. (R. at 456, 556-57.)

On September 16, 2008, Dr. Richard Surrusco, M.D., a state agency physician, reported that Gardner had the residual functional capacity to perform light work.[4] (R. at 338-43.) He reported that Gardner could occasionally climb and stoop and frequently balance, kneel, crouch and crawl. (R. at 340.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 340-41.)

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-9-

On November 17, 2008, Dr. Joseph Duckwall, M.D., another state agency physician, reported that Gardner had the residual functional capacity to perform light work. (R. at 366-72.) He reported that Gardner could occasionally climb and stoop and frequently balance, kneel, crouch and crawl. (R. at 368.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 368-69.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist

in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Gardner argues that the ALJ erred by failing to find that her impairment(s) met or equaled the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-11.) Gardner also argues that the ALJ did not give her subjective complaints sufficient consideration and that he did not consider her impairments in combination. (Plaintiff's Brief at 10-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason

-11-

or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Gardner argues that the ALJ erred by failing to find that her impairment(s) met or equaled the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Plaintiff's Brief at 7-11.) Section 1.04 requires that the disorder result in *compromise of the nerve root or the spinal cord* with either (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; or (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00(B)(2)(b).

For a claimant to demonstrate that her impairments meet or equal a listed impairment, she must prove that she "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, Gardner's impairment(s) do not meet or equal § 1.04 because the

record reveals no evidence of nerve root compression. On July 10, 2008, an MRI of Gardner's lumbar spine showed mild to moderate degenerative disc changes at the L4-L5 and L5-S1 levels; a tiny central disc nuclear protrusion and mild bulging of the annulus at the L4-L5 level; a combination of bulging annulus and mild arthritic changes of facet joints causing mild narrowing of the neural foramina on both sides at the L4-L5 level; and moderate bulging of the annulus slightly more asymmetrically toward the left than the right side at the L5-S1 level causing mild narrowing of the neural foramina on both sides at the L5-S1 level. (R. at 266-67, 330-32.) It was reported on February 18, 2009, that Gardner's chronic lumbago was controlled. (R. at 413.) Examinations showed Gardner's motor strength and gait to be normal, she had full range of motion of the spine and straight leg raising tests were negative. (R. at 337, 361, 363, 390, 438, 493.) In August 2008, Dr. Wiles diagnosed degenerative disc disease at the L4-L5 and L5-S1 levels with chronic low back pain. (R. at 337.) He recommended physical therapy and anti-inflammatory medication. (R. at 337.) In February and May 2009, Gardner stated that she felt fine with medication and that she did not have any problems. (R. at 389, 397.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Because there is no objective medical evidence of record showing that Gardner suffers nerve root or spinal cord compromise, she does not meet or equal § 1.04. Thus, substantial evidence supports the ALJ's failure to find that Gardner's impairments meet or equal § 1.04.

Gardner also argues that the ALJ erred by failing to properly consider the effect of her pain on her ability to perform substantial gainful activity. Again, I

-13-

disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers. ...

76 F.3d at 595.

In his decision, the ALJ noted that Gardner responded to medication and that her treatment was essentially routine and/or conservative in nature. (R. at 15, 17-19.) As noted above, the evidence of record supports this finding. The ALJ considered that Gardner cared for her preschool-aged child, cared for her personal needs, washed dishes, made simple meals, took care of the laundry and grocery

-14-

shopped. (R. at 13.) Furthermore, Gardner reported that her back pain was controlled with medication. (R. at 389, 397.) Finally, I note that Gardner was reminded by an emergency room physician of the legal problems associated with narcotics and that eventually she was no longer prescribed controlled substances because she was found to be abusing them. (R. at 271, 459.) For all of these reasons, I find that substantial evidence supports the ALJ's finding that Gardner does not suffer from disabling pain.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's finding that Gardner's impairment(s) did not meet or equal the requirements of § 1.04;

2. Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3. Substantial evidence exists to support the Commissioner's finding that Gardner was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Gardner's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

-15-

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: March 15, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE